# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| TAMMRA K. CRAIN, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. CIV-14-312-SPS |
| | ) |
| CAROLYN W. COLVIN, | ) |
| Acting Commissioner of the Social | ) |
| Security Administration, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

The claimant Tammra K. Crain requests judicial review pursuant to 42 U.S.C. § 405(g) of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for benefits under the Social Security Act. The claimant appeals the decision of the Commissioner and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby AFFIRMED.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423 (d)(2)(A). Social security regulations

implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997) [citation omitted]. The term substantial evidence has been interpreted by the United States Supreme Court to require "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The Court may not reweigh the evidence nor substitute its discretion for that of the agency. *Casias v. Secretary of Health & Human Services*, 933 F.2d 799, 800 (10th Cir. 1991). Nevertheless, the Court must review the record as a whole, and "[t]he substantiality of evidence must take into account whatever in the record

---

[1] Step One requires the claimant to establish that she is not engaged in substantial gainful activity. Step Two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity ("RFC") to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience, and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

**Claimant's Background**

The claimant was born on January 21, 1962, and was fifty-two years old at the time of the most recent administrative hearing (Tr. 132, 479). She completed the sixth grade, and has worked as a store laborer (Tr. 166, 155). The claimant alleges that she has been unable to work since an amended onset date of June 1, 2009, due to paranoid schizophrenia, congestive heart failure, restless leg syndrome, high blood pressure, and breathing problems (Tr. 161, 450).

**Procedural History**

The claimant applied for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85, on February 19, 2009. Her application was denied. ALJ Trace Baldwin conducted an administrative hearing and found that the claimant was not disabled in a written opinion dated September 20, 2010 (Tr. 15-23). The Appeals Council denied review, but this Court reversed on appeal in Case No. CIV-11-451-SPS, and remanded to the ALJ with instructions to properly assess the medical opinions in the record, particularly in relation to the claimant's mental impairment (Tr. 535-545). On remand, ALJ Bernard Porter conducted a second administrative hearing and again determined that the claimant was not disabled in a written opinion dated June 10, 2014 (Tr. 450-469). The Appeals Council again denied review, so ALJ Porter's

written opinion is the final decision of the Commissioner on appeal. *See* 20 C.F.R. § 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step five of the sequential evaluation. He found that the claimant had the residual functional capacity ("RFC") to perform less than the full range of light work as defined in 20 C.F.R. § 416.967(b), *i. e.*, she could lift/carry twenty pounds occasionally and ten pounds frequently, stand/walk about six hours in an eight-hour workday, sit six hours in an eight-hour workday, and that she could occasionally use foot controls, kneel, and climb ramps and stairs; frequently balance, crouch, and stoop; and never climb ladders or scaffolds, crawl, or work around unprotected heights or dangerous moving machinery. Additionally, he found that she could work in no environments where she would have concentrated exposure to humidity, wetness, dust, fumes, or gases, and avoid all environments where there are temperature extremes. He further found she required a sit/stand option allowing for a change in position at least every thirty minutes. Finally, he found she was limited to simple tasks with simple work decisions, could have occasional interaction with coworkers and supervisors but no interaction with the public, and she would be off-task 5% of the workday due to episodic symptomatology (Tr. 456). The ALJ concluded that although the claimant could not return to any past relevant work, she was nevertheless not disabled because there was work in the regional and national economy that she could perform, *i. e.*, housekeeping cleaner, small products assembler, and inspector packer (Tr. 234).

**Review**

The claimant contends that the ALJ erred: (i) by failing to develop the evidence in the record when he did not recontact a consultative examiner or order a new mental status examination, (ii) by failing to properly account for all her physical and mental impairments in her RFC assessment, and (iii) because the jobs identified at step five do not account for all her limitations. The undersigned Magistrate Judge finds the claimant's contentions unpersuasive for the following reasons.

ALJ Porter determined that the claimant had the severe impairments of hypertension, congestive heart failure, COPD, type II diabetes mellitus, history of hepatitis B, lumbar degenerative disc disease, bipolar disorder, PTSD, paranoid personality disorder, and polysubstance abuse, as well as the nonsevere impairments of obesity, minor degenerative changes of the cervical spine, degenerative changes of the left shoulder, and restless leg syndrome (Tr. 453). The claimant was discharged from the care of Dr. Ronald Myers at Wellness Clinic of Roland, because she had been arrested for selling her prescription medications, which violated her pain agreement with them (Tr. 224). Dr. Ben Cheek also treated the claimant, with records going back to December 2008. His treatment notes reflect that he treated her asthma and hypertension, and diagnosed her with Type II diabetes in February 2010 (Tr. 425-435). Dr. Cheek completed a form on June 9, 2009, stating that he was not treating the claimant for a mental condition (Tr. 268). On June 29, 2010, Dr. Cheek completed medical source statements (MSS) for both physical and mental impairments. As to the physical

assessment, he indicated that the claimant could occasionally lift/carry ten pounds and frequently lift/carry less than ten pounds; that her standing, walking, and sitting were not affected by her impairments; and that she was limited in her upper extremities for pushing and pulling, due to weakness, chronic fatigue, and generalized joint pains (Tr. 440-441). He further indicated that she could only occasionally climb, kneel, crouch, or crawl, and frequently balance, and that she was limited as to hazards such a machinery and heights, but unlimited in other environmental limitations, including fumes, odors, chemicals, and gases (Tr. 441-442). As to the Mental MSS, Dr. Cheek indicated that the claimant had marked limitations in the abilities to maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, and complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 444). He further indicated she had moderate limitations in the abilities to: understand and remember detailed instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and set realistic goals or make plans independently of others (Tr. 443-445). In support, he stated, "short attention span with flighty conversation, rapid speech" (Tr. 446). He believed she could manage funds (Tr. 446).

On June 3, 2009, Dr. Robert L. Spray, Jr., conducted a mental status and evaluation of adaptive functioning with regard to the claimant (Tr. 261). He noted that she was cooperative with the interview; that her speech was spontaneous but also rapid, pressed, and plosive; and that her affect was appropriate and variable (Tr. 262). He estimated her IQ at 74-79 with cultural deprivation, but stated that her level of adaptive functioning was not consistent with a diagnosis of mental retardation (Tr. 263-264). He diagnosed her with bipolar disorder, mixed, currently without psychotic features; polysubstance abuse in early remission; and PTSD (Tr. 263). He stated that she communicated adequately with him, but that in a job setting she may have some difficulty communicating because of her rapid, pressed, and plosive speech pattern; and that her concentration was moderately impaired, persistence was fair, and pace was slow (Tr. 264). He did not believe she could manage funds if awarded, because her math skills were poor and in light of her history of substance abuse (Tr. 264).

Upon reviewing the claimant's record, Dr. Phillip Massad found the claimant had moderate restrictions in all three areas of functional limitations, and that there was insufficient evidence related to episodes of decompensation (Tr. 280). He completed a mental RFC assessment, indicating that the claimant was markedly limited in the abilities to understand and remember detailed instructions, carry out detailed instructions, and interact appropriately with the general public (Tr. 284-285). He then stated that the claimant had sufficient concentration and memory to do simple, repetitive tasks but not detailed or complex tasks as evidenced her functioning "at MSE" and ability to undertake

a variety of everyday life demands. He found she would be limited in the ability to work with the general public, that she could adapt to changes in a familiar environment, and that there was nothing in the records to suggest the claimant's reports were not credible or that the information was inconsistent (Tr. 286).

Dr. Mohammed Quadeer conducted a physical examination of the claimant on July 9, 2009 (Tr. 289). He noted she was cooperative, nourished, not in any acute distress, and that her speech was "100% intelligible" (Tr. 290). He stated that she had anxiety but thought processes appeared normal, and assessed her with: shortness of breath due to asthma, congestive heart failure, hypertension not under good control with medications, history of hepatitis B, occasional numbness in her feet and legs, and paranoid schizophrenia (Tr. 291).

The claimant was hospitalized in 2012 for an acute exacerbation of COPD, hypertension, hypoxemia, and diabetes mellitus, and discharged four days later in stable condition (Tr. 664). She was hospitalized again in June 2013 with complaints of right-sided weakness. She was discharged two days later, and discharge paperwork indicates diagnoses of numbness right side, hypertension, diabetes, CHF, and COPD (Tr. 903).

At the most recent administrative hearing in 2014, the claimant's ex-husband testified that he and his wife separated due to her mood swings, and that she was "just wild" (Tr. 503). He stated that she could not get along with anybody (him, her mother, her sisters, her children) for very long, and that it had gotten worse over the previous year (Tr. 504-505, 507). He stated that she did not seek mental health treatment because she

told him she could not afford it (Tr. 506). As to her physical impairments, he testified that she had bad legs that would get red and break out, and that she had breathing problems and had been trying to quit smoking (Tr. 504).

The claimant contends that the ALJ committed error at step four by: (i) failing to account for the effects of her multiple physical impairments, including COPD, congestive heart failure, diastolic dysfunction, and a cerebrovascular accident; and (ii) failing to account for her mental impairments by rejecting her ex-husband's testimony and not giving Dr. Spray's opinion the weight it deserved. But the ALJ provided a thorough discussion of the relevant evidence in the record, and his opinion clearly indicates that he adequately considered the evidence in reaching his conclusions regarding the claimant's RFC. *Hill*, 289 Fed. Appx. 289, 293 (10th Cir. 2008) ("The ALJ provided an extensive discussion of the medical record and the testimony in support of his RFC finding. We do not require an ALJ to point to 'specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before [he] can determine RFC within that category.' "), *quoting Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004).

For example, the claimant asserts that her COPD causes an overall diminution in productivity and the ability to sustain an active work day, and that flare-ups cause additional limitations, and furthermore, that her congestive heart failure and diastolic dysfunction cause fatigue that the ALJ did not properly account for. But the ALJ discussed each of these impairments, and further connected them to his RFC assessment when he specifically stated that a range of light work was:

> appropriate in light of the findings on examination, including the normal gait, lack of motor or sensory deficits, and normal extremities with good hand and grip function. Due to her diabetes, with claimed leg pain but no sensory deficit on examination, I find she should be required to operate foot controls no more than occasionally. Due to this also, as well as her mild lumbar degenerative changes with isolated abnormal findings on some examinations, I find she can balance, crouch, and stoop no more than frequently. She could occasionally climb ramps and stairs, but never climb ladders or scaffolds. Due to her congestive heart failure, hypertension, COPD, and diabetes, I find that crawling would be too taxing for her, and she must never be required to perform it. Due to these, she cannot work around unprotected heights or dangerous moving machinery, cannot work in environments where she would have concentrated exposure to humidity, wetness, and dust, fumes, or gases, and must avoid all environments where there are temperature extremes. Due to her lumbar degenerative changes, I find it reasonable she be allowed a sit or stand option, as defined above, to allow for positional relief of pain or discomfort.

(Tr. 466). Finally, as to the alleged cerebrovascular accident, the medical records from the hospital visit indicate that a cerebrovascular accident was considered, but she was actually assessed with, as relevant, right sided numbness, tingling, and weakness secondary to transient ischemic attack versus cerebrovascular accident versus vitamin B12 deficiency, which the ALJ noted in his written opinion (Tr. 462, 825). Furthermore, her discharge documentation indicated that she had been admitted for right sided weakness, and her discharge diagnoses were numbness right side, hypertension, diabetes, congestive heart failure, and COPD, but not a cerebrovascular accident (Tr. 903). *See Corber v. Massanari*, 20 Fed. Appx. 816, 822 (10th Cir.2001) ("The final responsibility for determining RFC rests with the Commissioner, and because the assessment is made based upon all the evidence in the record, not only the relevant medical evidence, it is

well within the province of the ALJ."), *citing* 20 C.F.R. §§ 404.1527(e)(2); 404.1546; 404.1545; 416.946.

Additionally, the ALJ was required to assign controlling weight to the medical opinions of treating physicians only if they were "'well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . [and] consistent with other substantial evidence in the record.'" *Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004), *quoting Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). And even if medical opinions are not entitled to controlling weight, the ALJ must determine the proper weight to give them by analyzing the factors set forth in 20 C.F.R. § 404.1527. *Langley*, 373 F.3d at 1119 ("Even if a treating physician's opinion is not entitled to controlling weight, '[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [§] 404.1527.'"), *quoting Watkins*, 350 F.3d at 1300 and Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The pertinent factors include: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Watkins*, 350 F.3d at 1300-01, *citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001).

The ALJ's conclusions "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Watkins* at 1300, *quoting* Soc. Sec. Rul. 96-2p, 1996 WL 374188 at *5.

The ALJ's treatment of Dr. Cheek's opinion meets these standards. He assigned "little weight" to Dr. Cheek's physical MSS because: (i) he is a general practitioner and has no specialization; (ii) the limitations he assessed of weakness, fatigue, and joint pains were inconsistent with his treating notes, which actually stated no findings of weakness on exam; (iii) even if she did endorse fatigue or weakness, his treatment of her was conservative and included no specific prescription for these impairments; (iv) the finding of weakness was inconsistent with Dr. Quadeer's physical consultative examination; and (v) his MSS included no limitation related to her COPD, despite the fact he prescribed her an inhaler (Tr. 463). As to Dr. Cheek's mental MSS, the ALJ noted that his description of her as "short attention span with flighty conversation and rapid speech" was not in his treating notes, Dr. Cheek is not a mental health professional, he did not treat her for a mental impairment, and his treating notes indicated no psychiatric symptoms. Additionally, he stated she communicated adequately with him, despite the statement about her speech, and her speech was 100% intelligible at the consultative exam (Tr. 463). The ALJ's opinion was sufficiently clear for the Court to determine the weight he gave to Dr. Cheek's opinions, as well as sufficient reasons for the weight assigned. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) ("The ALJ provided

good reasons in his decision for the weight he gave to the treating sources' opinions. Nothing more was required in this case."), *citing* 20 C.F.R. § 404.1527(d)(2).

As to Dr. Spray's mental assessment, the ALJ gave this opinion only "some weight," finding portions of it to be overly speculative. More specifically, the ALJ pointed out that although Dr. Spray said she may have trouble communicating with others, he stated she adequately communicated with him. Additionally, his statement that she was easily provoked to anger in a job setting was based only on the claimant's report, and even if he found it credible, she was cooperative with Dr. Spray and he recorded no issues with her, she also reported getting along fine with people on the job as long as they did not "mess with" her, and she has never sought treatment for her reported mood swings (Tr. 464). The claimant argues that the ALJ erred by failing to give Dr. Spray's opinion substantial weight, but the Court finds no error. *See Flaherty v. Astrue*, 515 F.3d 1067, 1072 (10th Cir. 2007) ("The ALJ rejected Dr. Van de Graaff's limitations on handling and grasping because the limitations were not only contrary to the other evidence in the record, but also contrary to Dr. Van de Graaff's own examination findings. . . . [T]hese were legitimate reasons for rejecting Dr. Van de Graaff's opinion.").

Furthermore, the claimant contends that ALJ should have recontacted Dr. Spray to obtain a medical source statement for clarification, or ordered an updated consultative examination. While an ALJ may not engage in unsubstantiated speculation to reject a treating physician opinion, *see, e. g., McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th

Cir. 2002) ("In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*.") [emphasis in original], *quoting Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000), there is no indication here that the ALJ rejected Dr. Spray's opinion in this fashion. If the ALJ had any doubts what Dr. Spray meant, he had the discretion to recontact the doctor to clear it up. *See* 20 C.F.R. § 404.1520b(c) ("[I]f after weighing the evidence we determine we cannot reach a conclusion about whether you are disabled, we will determine the best way to resolve the inconsistency or insufficiency . . . We may recontact your treating physician, psychologist, or other medical source."). Absent such concerns, the ALJ was not (as the claimant suggests) required to do so. The ALJ also has broad latitude in deciding whether or not to order a consultative examination. *Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997), *citing Diaz v. Secretary of Health & Human Services*, 898 F.2d 774, 778 (10th Cir. 1990). "When the claimant has satisfied his or her burden" of presenting evidence suggestive of a severe impairment, "then, and only then, [it] becomes the responsibility of the ALJ to order a consultative evaluation if such an examination is necessary or helpful to resolve the issue of impairment." *Id*. at 1167. A consultative examination also may be required if there is a direct conflict in the medical evidence, the medical evidence is inconclusive, or when additional tests are needed to explain a diagnosis already in the record. *Id*. at 1166 [citations omitted]. In this case, the claimant

asserts that the ALJ should have ordered an additional CE exam upon remand simply because he rejected portions of Dr. Spray's assessment, but that misstates the standard. Additionally, claimant's counsel did not request that the ALJ order an additional consultative examination regarding the claimant's mental impairments, and the need is not clearly established by the record here. *Hawkins*, 113 F.3d at 1168 (noting that without a request by counsel, a duty will not be imposed on the ALJ to order an examination unless the need is clearly established in the record).

Social Security Ruling 06-03p provides the standards for evaluation of third party evidence such as that provided by the claimant's ex-husband. Other source evidence, such as functional reports or testimony from spouses, parents, friends, and neighbors, should be evaluated by considering the following factors: (i) the nature and extent of the relationship; (ii) whether the evidence is consistent with other evidence; and (iii) any other factors that tend to support or refute the evidence. Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006). Here, the ALJ noted the standard and his relationship with the claimant, and gave his testimony little weight because there was no medical evidence in the record to substantiate the description of the claimant's mood swings or leg swelling, and no doctor had found her anything but cooperative on examination (Tr. 465).

The essence of the claimant's appeal here is that the Court should re-weigh the evidence and determine his RFC differently from the Commissioner, which the Court simply cannot do. The ALJ specifically noted every medical record available in this case,

*and still concluded* that he could work. *See Hill*, 289 Fed. Appx. at 293 ("The ALJ provided an extensive discussion of the medical record and the testimony in support of his RFC finding. We do not require an ALJ to point to 'specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before [he] can determine RFC within that category.'"), *quoting Howard*, 379 F.3d at 949. *See also Corber v. Massanari*, 20 Fed. Appx. 816, 822 (10th Cir. 2001) ("The final responsibility for determining RFC rests with the Commissioner, and because the assessment is made based upon all the evidence in the record, not only the relevant medical evidence, it is well within the province of the ALJ."), *citing* 20 C.F.R. §§ 404.1527(e)(2); 404.1546; 404.1545; 416.946.

The claimant's final contention is that she cannot perform the jobs identified by the ALJ because she cannot perform light work. But the ALJ concluded otherwise, and as discussed above, substantial evidence supports the ALJ's determination in this regard. The claimant's third contention is therefore without merit.

**Conclusion**

In summary, the Court finds that correct legal standards were applied by the ALJ, and the decision of the Commissioner is therefore supported by substantial evidence. The decision of the Commissioner of the Social Security Administration is accordingly hereby AFFIRMED.

**DATED** this 28th day of September, 2015.

_____

**STEVEN P. SHREDER**
**UNITED STATES MAGISTRATE JUDGE**